**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **WM CAPITAL PARTNERS 53, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Civil No. 17-1122 (ADC)** |
| **BARRERAS INC., et al.,** | |
| **Defendants.** | |

## <u>OPINION AND ORDER</u>

Before the Court is plaintiff WM Capital Partners 53, LLC's ("plaintiff") motion for summary judgment and supporting documents, **ECF No. 26**, and co-defendant Barreras Inc.'s ("Barreras") opposition thereto and cross-motion for summary judgment, **ECF No. 30**. Plaintiff opposed the cross-motion, **ECF Nos. 39, 40**, and Barreras filed a reply, **ECF No. 44-1**. Co-defendant Gables Towers, Inc. ("Gables") has not appeared in the case thus far. Plaintiff also filed an emergency motion for writ of provisional remedy. **ECF No. 58**. Barreras filed a motion requesting more time to respond to the emergency motion and moved for leave to file Spanish language documents. **ECF Nos. 59, 61**. For the following reasons, plaintiff's motion for summary judgment, **ECF No. 26**, is **GRANTED**. The filings at **ECF Nos. 58, 59, 61,** are **MOOT**. Barreras's cross-motion for summary judgment is **DENIED**. **ECF No. 30**. Clerk of Court shall enter

judgment as to all defendants in favor of plaintiff.[1] Plaintiff shall submit a proposed declaration for the Court's consideration by April 30, 2019.

## I.      Background

Plaintiff filed a complaint seeking declaratory relief under 28 U.S.C. §§ 2201, 2202, and Rule 57 of the Federal Rules of Civil Procedure. **ECF No. 1**. Plaintiff is the creditor of an outstanding debt of over $32 million originally secured by a leasehold mortgage and mortgages on a commercial development in San Juan, Puerto Rico ("Citi Towers Complex"). *Id.* at 2. Gables is the current debtor on the mortgages, which were executed "to fund the construction, purchase and ongoing maintenance of the Citi Towers Complex" located on a plot of land leased from Barreras. *Id.*

The present case arises in the wake of Gables's default on the lease with Barreras and the corresponding state court and arbitration proceedings between Gables and Barreras related to the default. Plaintiff seeks a declaratory judgment solidifying its purported right to be subrogated into the position of lessee under P.R. Laws Ann., tit. 30, § 6086 ("Article 59(7)") (certified translation at **ECF No. 27-41**). **ECF No. 27** at 16. Barreras contends that plaintiff's rights under Article 59(7) have already been litigated in state court and during a binding arbitration proceeding. **ECF No. 30** at 3–4. Accordingly, Barreras cross-moves for summary judgment

---

[1] Although plaintiff brings the motion solely against Barreras, it has requested relief against all defendants. **ECF No. 26** at 1, 15. Gables defaulted in this case, having filed no answer to the complaint after being served with summons on February 3, 2017. **ECF No. 8**. Given the undisputed facts discussed below, judgment against Gables is also warranted.

arguing that plaintiff's federal case is barred by principles of res judicata. *Id.* at 21–23. Alternatively, Barreras requests this Court to certify to the Puerto Rico Supreme Court the question of first impression posed by plaintiff's request: whether and how Article 59(7) applies in this scenario. **ECF No. 44-1** at 14 n.5.

Plaintiff opposes, arguing that the arbitration and corresponding state court decisions are not binding on it because those tribunals denied plaintiff's and its predecessor's requests to intervene. **ECF Nos. 39** at 1–2**; 40** at 13. Plaintiff also argues that Barreras's cross-motion for summary judgment is not compliant with this Court's anti-ferret rule. **ECF No. 39** at 21–25; **40**.

### A.      Uncontested Facts[2]

1.   WM Capital is a limited liability company organized under the laws Delaware. **ECF Nos. 27** at 1; **32** at 1.

2.   Barreras is a Puerto Rico for profit corporation. **ECF Nos. 27** at 1; **32** at 2.

3.   Gables is a Puerto Rico for profit corporation. *Id.*

4.   In 1960, Barreras's predecessor, as lessor, entered a lease with a renewable period of up to ninety-nine years with The First National City Bank of New York (the "Deed of Lease").[3] The Deed of Lease pertained to a parcel of land in the Hato Rey Ward of San Juan and included a grant of construction rights to the lessee. The Deed of Lease was

---

[2] The parties have submitted several proposed statements of uncontested facts and oppositions thereto. **ECF Nos. 27, 32, 33, 40**. The uncontested facts are derived from a synthesis of those filings.

[3] The parties' statements of uncontested fact go into great detail about the succession of the Deed of Lease and subsequent mortgage obligations secured by the Deed of Lease and Citi Towers Complex. Many of these details are not recounted here, because they are not pertinent to the outcome of the pending motions.

recorded at page 61, of Volume 717 of the Puerto Rico Property Registry of San Juan, Section II, Río Piedras North, on property 20,584. **ECF No. 27** at 2–3, **27-5** at 2; **32** at 2.

5.  On March 31, 1988, a "Deed of Construction" was executed to notify the Puerto Rico Property Registry Registrar of the constructed office complex so that the structures could be recorded as a separate and independent property, subject to the leasehold right. The structures described in the "Deed of Construction," were recorded at page 111 of Volume 1,295 of the Puerto Rico Property Registry of San Juan, Section II, Río Piedras North and identified as property 35,957. The buildings constructed on the parcel eventually became known as the Citi Towers Complex. **ECF Nos. 27** at 4; **27-6; 27-7; 32** at 3.

6.  Two mortgages over the leasehold estate were executed and recorded in the Puerto Rico Property Registry in 1998, by one of Gables's predecessors-in-interest, Lincoln Realty, Inc.

7.  In 2005, Gables became the successor-in-rights to the original lessee. Gables executed two additional mortgages—one in 2005 and one in 2006—and a restructuring amendment to the 2006 mortgage in 2009. **ECF Nos. 27** at 4–9; **32** at 3–4.

8.  Pertinent to the issues on summary judgment, the Deed of Lease states:

> NINE: During the term of this lease, Tenant shall be the owner of the New Building. At any time after Tenant shall have completed its investment of not less than ONE MILLION DOLLARS ($1,000,000.00) in reconstructing, remodelling [sic], or rebuilding as contemplated in paragraph SEVEN hereof, the Tenant shall have the option to terminate this lease contract and to surrender possession of the leased land and ownership of the New Building to the Landlord, without any liability to the Landlord other than for payment of rent up to the effective date of such termination. The Tenant shall give the Landlord not less than thirty (30) days' written notice of its election to terminate the lease under this paragraph. Upon termination of

this lease, by expiration of its term, by Tenant's exercise of its option to terminate, or otherwise, the Landlord shall become owner, without liability to the Tenant, and without obligation to reimburse buildings and structures [to] the Tenant, of all the improvements/which the Tenant may have made in the leased premises, excepting only movable fixtures such as cages, counters, screens, vault doors, vault frames and lining, grill doors to vaults, air conditioning equipment, lighting fixtures, and the like. For the purposes of these provisions, assignments or subleases under paragraph THIRTEEN shall not be construed as termination of this Lease. Upon any such termination of the lease, the Tenant shall have the right, but not the obligation, to remove all such movable fixtures within thirty (30) days following the effective date of termination, or within such further period as the Landlord may allow; and if the Tenant should fail to remove the same within such period, such movable fixtures shall become property of the Landlord, and the Landlord shall not be obligated to make any payment to the Tenant therefor.

**ECF No. 27-4** at 11–12.

9.  In paragraph thirteen, the Deed of Lease allows the tenant, "to freely, and from time to time, in its sole discretion: (i) assign the whole or any part of this lease" or "sublease the whole or any portion of the Building for any purpose." *Id*. at 14–15.

10. As of April 30, 2010, R-G Premier Bank of Puerto Rico ("R-G Bank") was creditor of the mortgages with Gables. On that date, the Office of the Commissioner of Financial Institutions of Puerto Rico closed R-G Bank. The Federal Deposit Insurance Corporation ("FDIC") became R-G Bank's receiver. Scotiabank de Puerto Rico ("Scotiabank") executed a Purchase and Assumption Agreement with the FDIC and substituted R-G Bank as creditor in the loan agreements with Gables. **ECF Nos. 27** at 9; **32** at 4–5.

11. On July 17, 2012, Scotiabank initiated collection and foreclosure proceedings against Gables and other guarantors before the Court of First Instance of Puerto Rico, San Juan

Part, alleging that Gables and others defaulted on their obligations (the "foreclosure

case"). Scotiabank claimed payment in excess of $30 million and requested foreclosure of

the leasehold mortgage and the other mortgages executed with Gables. Barreras later

requested to intervene, which the Court of First Instance granted. *Gables Towers, Inc. v.*

*Barreras, Inc.*, 2018 WL 2418479 (T.C.A. Apr. 30, 2018) (certified translation at **ECF No. 46-**

**1** at 3–5).[4] **ECF Nos. 27** at 13; **32** at 7.

12. By September 27, 2013, Gables owed approximately $809,957.24 in property tax arrears to

the Commonwealth of Puerto Rico Municipal Revenue Collection Center ("CRIM"). **ECF**

**Nos. 27** at 10; **32** at 5.

13. Barreras notified Gables by a letter dated and received on October 1, 2013, of Gables's

obligation to pay property taxes to CRIM under the Deed of Lease. Pursuant to the terms

of the Deed of Lease, Barreras informed Gables that it must pay the full tax debt accrued

to CRIM within fifteen days otherwise Barreras would pursue legal remedies and

terminate the lease. *Id*.

14. On October 15, 2013, Gables's attorney sent a letter to Barreras informing Barreras of its

intent to hire an attorney to contest CRIM's valuations. As of said date, Gables did not

know whether its debt with CRIM was contestable and it had not taken steps to pay the

CRIM taxes. Gables did not ask Scotiabank to pay CRIM. **ECF Nos. 33** at 5; **40** at 5.

---

[4] The Court takes judicial notice of the above-cited, and several other factually relevant Puerto Rico court decisions. *See Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 322 (1st Cir. 2004) (per curiam) (Lipez, J., concurring).

15. Gables failed to timely pay the property tax debt or take any steps to secure payment of the taxes on its behalf by Scotiabank. **ECF Nos. 27** at 10; **32** at 5.

16. Barreras sent another letter to Gables on October 16, 2013, exercising its right to terminate the Deed of Lease in light of Gables's failure to pay the property taxes and its failure to report any actions to remedy the breach within the fifteen-day cure period allotted in the lease. Barreras requested a meeting with Gables to discuss the procedures as a result of the termination of the Deed of Lease, which Gables ignored. **ECF Nos. 27** at 10–11; **32** at 5; **33** at 6; **40** at 5.

17. Sometime around October 17, 2013, Scotiabank executives met to discuss Gables's CRIM debt and Barreras's letters to Gables. **ECF Nos. 27** at 11; **32** at 5.

18. On October 28, 2013, Barreras filed a complaint for eviction against Gables in state court (the "eviction case"). *Barreras, Inc. v. Gables Towers, Inc.*, 2014 WL 3849923, at *2 (T.C.A. June 30, 2014) (certified translation at **ECF No. 17-1**).

19. On November 5, 2013, a tax attorney informed Gables that the time to challenge the tax assessment had expired. Gables did not hire the tax attorney to contest CRIM's assessment. **ECF Nos. 33** at 6**; 40** at 5.

20. Between November 3 and November 8, 2013,[5] Scotiabank made the decision to pay Gables's debt to CRIM. Scotiabank issued a check for $826,538.86 and delivered it to its

---

[5] The parties dispute when Scotiabank obtained notice of Gables's failure to pay the property taxes. **ECF Nos. 27** at 11–12; **32** at 5–7. The dispute relates to the language used in the arbitration decision. The arbitrator implied that

legal representative to pay CRIM the outstanding balance plus interest and surcharges. The past-due debts at issue were paid on November 12, 2013. The procedure employed by Scotiabank in this case in deciding to pay the tax debt and executing the payment is a standard procedure for the bank. **ECF Nos. 27** at 11–12; **32** at 6–7; **33** at 7**, 40** at 6.

21. On December 2, 2013, Scotiabank moved to intervene in the eviction case. *Barreras*, 2014 WL 3849923, **ECF No. 17-1** at 2. The court denied its request on February 4, 2014, and the appeals court denied its request for reconsideration. *Id*. at 2, 5–6.

22. Although the Court of First Instance ultimately granted Barreras's request for eviction, the Puerto Rico Court of Appeals vacated that ruling, as well as the lower court's intervention ruling against Scotiabank. *Barreras, Inc. v. Gables Towers, Inc.*, 2014 WL 5526037, at * 1–2, 6–7 (T.C.A. Sept. 24, 2014) (certified translation at **ECF No. 16-2**). In essence, the appellate court ruled that the Deed of Lease obligated the parties to resolve their disputes through arbitration. *Id*. at *5–6. Likewise, the appellate court held that Scotiabank's right to intervene was a matter for the arbitrator to decide. *Id*. at *7.

23. On December 18, 2014, Gables received an "embargo notification" from CRIM for three payments totaling $573,538.06, corresponding to the first and second six-month periods of 2014 and the first six-month period of 2015. Scotiabank became aware of the embargo notification on January 8, 2015. Scotiabank paid the debt in relation to the embargo

---

Scotiabank was aware of Gables's debt prior to October 17, 2013, having identified the debt in its quarterly reports on the mortgages related to the Citi Towers Complex. **ECF No. 27-27** at 19.

notification on January 15, 2015, employing the same procedure used in paying CRIM in November 2013. Scotiabank continued to pay the property taxes on Citi Towers Complex to CRIM until it transferred its creditor rights to plaintiff, at which point plaintiff continued to pay the property taxes. **ECF Nos. 27** at 12, 19; **32** at 7, 12; **33** at 8; **40** at 7.

24. On May 21, 2015, Barreras submitted a request for arbitration, designating Gables as the sole respondent. Its arbitration request sought termination or expiration of the lease, eviction of the tenant, and determination of the ownership rights to Citi Towers Complex. **ECF No. 27-27** at 3.

25. Scotiabank sought to intervene in the arbitration, asserting that it had a mortgage right over the Deed of Lease pursuant to P.R. Laws Ann., tit. 30, § 2554(6) (current version at Article 59(7)). On October 21, 2015, the arbitrator denied the request. **ECF No. 27-29.**

26. Sometime before or around October 15, 2015, plaintiff acquired from Scotiabank the loans subject to the foreclosure case. Plaintiff's substitution as plaintiff in the foreclosure case was finalized on November 5, 2015.[6] **ECF Nos. 27** at 13–14; **32** at 8.

27. On October 28, 2015, plaintiff attended an arbitration hearing between Barreras and Gables. Barreras objected to plaintiff's attendance. The arbitrator requested briefing on the matter, ultimately denying plaintiff's request to attend. The arbitrator concluded that

---

[6] It is unclear from the record before the Court whether the foreclosure case has since been resolved. Barreras contends that "Partial Judgment has been issued . . . wherein WM Capital chose to foreclose the mortgages by way of a personal action (collection of monies owed) against Gables' individual guarantors thus not limiting WM Capital actions or remedies to collect owed moneys from Gables." **ECF No. 32** at 7.

plaintiff did not have an interest under the Deed of Lease over which she could validly exercise authority. **ECF Nos. 27** at 14; **27-29**; **32** at 8–9.

28. On April 22, 2016, Gables delivered natural possession of Citi Towers Complex to plaintiff for plaintiff to perform interim administration for conservation purposes. Plaintiff does not have a formal decree allowing it to perform these tasks. **ECF Nos. 27** at 19; **32** at 12.

29. On September 28, 2016, the arbitrator issued an decision concluding, among other things, that Gables breached the terms of the Deed of Lease and that Barreras legally terminated the Deed of Lease on October 16, 2013. As a result, the arbitrator concluded that Barreras was entitled to receive ownership of the building. **ECF Nos. 27** at 15; **32** at 9–10..

30. On October 31, 2016, Gables petitioned for review of the arbitration award in state court. On February 3, 2017, plaintiff sought to intervene in that case, which the court denied on February 7, 2017. **ECF Nos. 27** at 15–16; **32** at 10.

31. On January 26, 2017, plaintiff filed the underlying litigation in federal court, asserting this Court's diversity jurisdiction. **ECF No. 1**.

32. On December 6, 2017, the state court confirmed the arbitration award. Gables did not seek further appellate review. *See Gables Towers Inc. v. Barreras, Inc.*, KAC2016-1090 (C.F.I. Dec. 6, 2017) (certified translation at **ECF No. 21-1** at 15–24).

33. On December 28, 2017, plaintiff sent a letter to Barreras that, among other matters, expressed plaintiff's intent to exert its subrogation rights under Article 59(7). Plaintiff's letter stated, in relevant part,

Puerto Rico mortgage law provides that when a mortgage over a recorded lease (like the one that WM Capital holds over the Deed of Lease) is terminated for reasons attributable to the will of the lessee (failure to comply with the terms of the lease), the mortgage creditor or mortgagee (WM Capital), may subrogate in the place and stead of the lessee (Gables Towers) as an assignee.

In light of the very clear provisions of the law, we are hereby reiterating WM Capital's unequivocal intention to exert that subrogation right as a result of your termination of the Deed of Lease. As the law allows, that subrogation right can be agreed to with the lessor without resorting to the Courts. Therefore we are hereby inviting Barreras, Inc. to accept WM Capital as its subrogated lessee for the reminder [sic] of the term of the Deed of Lease. Please inform at your earliest convenience if Barreras, Inc. is willing to pursue this solution.

**ECF Nos. 27** at 17–18; **27-36**; **32** at 11.

34. On January 5, 2018, Barreras responded by letter, disagreeing with plaintiff's assertion of a subrogation right but agreeing to meet with plaintiff's attorneys to explore a "non-litigious solution." **ECF Nos. 27** at 18; **27-37**; **32** at 11.

35. On February 15, 2018, Barreras filed a motion seeking execution of judgment before the Court of First Instance. *Gables Towers, Inc.*, 2018 WL 2418479, **ECF No. 46-1** at 10. That court ordered the Property Registrar to, among other things, cancel certain liens and encumbrances on the property. *Id.* at 10–11. This prompted plaintiff to file a writ of certiorari in the Puerto Rico Court of Appeals, alleging it was denied due process of law by the lower court's order, which had the effect of erasing its mortgage rights without any judicial or arbitrational entity permitting plaintiff's participation in the underlying

proceedings. *Id*. at 11. The Court of Appeals denied the petition on timeliness grounds, with one judge dissenting. *Id*. at 11–14, 16–19.

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See Matusevich v. Middlesex Mut. Assur. Co.,* 782 F.3d 56, 59 (1st Cir. 2015) (noting that the procedural posture created by a cross-motion for summary judgment does not change the applicable standard of review; rather, it requires the court to determine whether either moving party deserves judgment as a matter of law). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. United States Dept. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). Facts not properly controverted in accordance with Local Civil Rule 56 "shall be deemed admitted." *Puerto Rico Am. Ins. Co. v. Rivera-Vázquez*, 603 F.3d 125, 130–31 (1st Cir. 2010). All reasonable inferences are drawn in favor of the non-moving party. *Collazo-Rosado v. University of P.R.*, 765 F.3d 86, 92 (1st Cir. 2014). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

"[T]o survive summary judgment a plaintiff is not required to rely only on uncontradicted evidence." *Calero-Cerezo*, 355 F.3d at 19 (emphasis omitted). When "the record as a whole presents many inconsistencies, displaying perspectives that favor in some lights the defendants

and in others the plaintiff," and "plaintiff's evidence is both cognizable and sufficiently strong

to support a verdict in her favor, the factfinder must be allowed to determine which version of

the facts is most compelling." *Id*.

Plaintiff seeks relief under the Declaratory Judgment Act ("DJA"). Section 2201 of the

DJA provides,

> In a case of actual controversy within its jurisdiction, . . . any court of the United
> States, upon the filing of an appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such declaration, whether or not
> further relief is or could be sought. Any such declaration shall have the force and
> effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a); *see id*. § 2202 (providing a mechanism by which "[f]urther necessary or

proper relief based on a declaratory judgment or decree may be granted"). "[T]he phrase 'case

of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are

justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citing

*Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937)). The declaration

requested must fall within "the type of relief that Article III allows courts to give—'decree[s] of

a conclusive character' adjudicating adverse parties' actual rights and interests." *In re: Financial

Oversight & Mgmt. Bd. for P.R.*, 916 F.3d 98, 111 (1st Cir. 2019) (alteration in original) (quoting

*Aetna Life*, 549 U.S. at 241).

The DJA does not, alone, provide federal jurisdiction. *See National Flour Mills & Supply

Co. LLC v. Orlando Santiago, Inc.*, 2009 WL 790011, at *2 (D.P.R. Mar. 16, 2009) (ADC) (citing 28

U.S.C. § 2201(a)); *see also Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 674 (1950) (noting

that whether "the declaratory remedy which may be given by the federal courts [is] available in the State courts is immaterial"). Plaintiff has properly asserted diversity jurisdiction in this case, which Barreras has not disputed.

"It is a black-letter rule that state substantive law supplies the rules of decision for a federal court sitting in diversity jurisdiction." *Lexington Ins. Co. v. General Accident Ins. Co. of Am.*, 338 F.3d 42, 46 (1st Cir. 2003). The remedy plaintiff requests under the DJA requires the Court to construe Article 59(7). "Statutory construction in Puerto Rico begins with the text of the underlying statute, and ends there as well if the text is unambiguous." *In re Plaza Resort at Palmas, Inc.*, 741 F.3d 269, 274 (1st Cir. 2014). Article 59(7) states,

> The following are mortgageable:
> . . . .
> (7) A registered leasehold interest, as long as the lessee is authorized to sell, assign, sublet or mortgage his/her right. The mortgage that is constituted on the lease shall be subject to the termination of the lease for reasons beyond the will of the lessee. If the termination is due to causes attributable to the will of the lessee, the mortgage title holder may be subrogated to the place and grade thereof as a transferee, either by agreement between the interested parties or by decision of a court, who may so agree as an interim precautionary measure or in a definitive manner, within the terms of the registered agreement. In any event, the court shall determine the alterations or modifications in the original debt in accordance to the equity of the case.

ECF No. 27-41.

## III.    Analysis

### A.    "Actual Controversy" Under the DJA

The first issue for the Court is to ascertain whether the present case constitutes an "actual controversy" under the DJA. *See Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 272

(1941); *accord In re: Financial Oversight*, 916 F.3d at 110–11. The basic question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas.*, 312 U.S. at 273. This is to ensure that a declaratory judgment is not granted "in speculative situations." *Public Affairs Assocs. Inc. v. Rickover*, 369 U.S. 111, 112 (1962) (per curiam). However, "a litigant does not have to await the consummation of threatened injury to obtain preventative relief." *State of R.I. v. Narragansett Indian Tribe*, 19 F.3d 685, 693 (1st Cir. 1994) (citation and internal quotation marks omitted). In other words, "[i]f the injury is certainly impending that is enough." *Id*. (citation and internal quotation marks omitted).

Plaintiff's claim for a declaratory judgment arises out of the undisputed facts that, (1) plaintiff is the holder of mortgages on both the leasehold interest and the buildings, and (2) Barreras validly terminated the lease with Gables. These facts, according to both parties, trigger the provisions of Article 59(7). Nonetheless, it is also undisputed by the parties that the state court granted Barreras's request for a writ of execution of judgment, ordering the Puerto Rico Property Registrar to enter Barreras's title to the Citi Towers Complex free of liens and encumbrances. *Gables Towers*, 2018 WL 2418479, **ECF No. 46-1** at 10–11. Plaintiff explains that the "substantial controversy" between the parties arises from Barreras's attempt "to take the buildings without paying the mortgage." **ECF No. 26** at 8. Accordingly, the Court finds that the present case constitutes an "actual controversy" under the DJA.

Barreras nonetheless argues that there is no controversy between the parties because title to Citi Towers Complex has been thoroughly litigated in the state courts and through arbitration, resulting in its receipt of ownership free and clear of all liens and encumbrances. According to Barreras, plaintiff's request is barred by principles of res judicata.[7] **ECF No. 30** at 3, 21–23, 33. According to Barreras, plaintiff has only itself to blame for failing to diligently "seek review of" the intervention rulings and arbitration award before the determinations became final. *Id*. at 23**.**

Under Puerto Rico law, for res judicata to foreclose a subsequent action, "it is necessary that . . . there be the most perfect identity between the things, causes, *and* persons of the litigants, and their capacity as such." P.R. Laws Ann., tit. 31, § 3343 (emphasis added). The use of the word "and" in the res judicata statute indicates that an identity among *all* of the enumerated characteristics is required to trigger the bar. *See United States v. Lawrence*, 675 Fed. App'x 1, at *4 (1st Cir. 2017) (interpreting a statute's use of the word "and" as creating multiple requirements). The res judicata statute explains that the "identity" element may also be satisfied when "litigants of the second suit are legal representatives of those who litigated in the preceding suit, or when

---

[7] In passing, Barreras suggests that principles of abstention should preclude this Court from granting plaintiff's requested relief. **ECF Nos. 30** at 2; **44-1** at 2. Barreras does not make any arguments or cite any legal authority in support of abstention. Although this is a judicially-created doctrine of restraint that may be raised sua sponte, the Court notes that abstention "is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers. Ascertainment of whether there exist the 'special circumstances,' prerequisite to its application must be made on a case-by-case basis." *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964) (citation omitted). Here, the local law at issue is not unclear and abstention would further delay this already-protracted dispute. Thus, this Court's discretionary application of the equitable doctrine would be "inappropriate" in this case. *See Griffin v. County Sch. Bd. of Prince Edward Cty.*, 377 U.S. 218, 229 (1964) (holding that abstention was not appropriate because the state supreme court already reviewed the law at issue and the age of the case rendered the need for decision "imperative[]," noting that abstention would delay the case further); *accord Hostetter v. Idlewind Bon Voyage Liquor Corp.*, 377 U.S. 324, 329 (1964); *Ortega-Cabrera v. Municipality of Bayamón*, 562 F.2d 91, 98 n.3 (1st Cir. 1977).

they are jointly bound with them or by the relations established by the indivisibility of

prestations among those having a right to demand them, or the obligation to satisfy the same."

P.R. Laws Ann., tit. 31, § 3343.

Here, no such "perfect" identity exists and Barreras does not cite any facts or argument

that plaintiff is Gables's "legal representative[]." Plaintiff was specifically excluded from the

proceedings that Barreras now claims bar plaintiff's present case. As plaintiff points out,

"Barreras actively advocated that WM Capital not be allowed to participate in any way" in the

eviction and arbitration proceedings, "arguing that WM Capital would have its day in court once

the underlying proceeding was complete." **ECF No. 26** at 5–6. And, as the arbitrator's decision

clearly states, she excluded plaintiff and Scotiabank from participating in the arbitration

proceedings because they did not have a claim under the Deed of Lease. The arbitrator explained

that her jurisdiction was limited to arbitrating claims arising under the Deed of Lease between

the signatories to the lease. **ECF Nos. 27-29** at 4; **27-33** at 3. Plaintiff's claim under Article 59(7),

as explained by Barreras in its previous filings before this Court, was not ripe until the arbitrator

found Gables in breach of the Deed of Lease for failure to timely pay CRIM. **ECF No. 15-1** at 2–

4. Barreras has further asserted that plaintiff's Article 59(7) claim was not ripe until the appeals

process over the arbitration award had concluded. *Id*. at 3–4. Thus, as Barreras is well aware,

neither plaintiff nor its Article 59(7) claim were part of the arbitration and state court

proceedings. There is not even a general discussion of liens and encumbrances over the Citi

Towers Complex in the arbitration decision. Accordingly, the necessary identity of claims and

parties is not present to trigger res judicata.[8]

Likewise, as presumably understood by Barreras given its opposition to plaintiff's and

Scotiabank's participation in the arbitration proceedings, arbitration agreements are generally

not binding on parties "not mentioned in the written agreement." *See* 4 Am. Jur. 2d Alternative

Dispute Resolution § 62. That is because "arbitration is simply a matter of contract between the

parties; it is a way to resolve those disputes—but only those disputes—that the parties have

agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

And, "of course, as a general proposition, a contract cannot bind a non-party." *Grand Wireless,*

*Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 9 (1st Cir. 2014). There are limited exceptions through

which non-signatories may assert rights under or be bound by an arbitration agreement. *See, e.g.,*

*Hogan v. SPAR Grp., Inc*. 914 F.3d 34, 40–42 (1st Cir. 2019) (addressing whether principles of

equitable estoppel binds a non-signatory to an arbitration agreement); *Grand Wireless*, 748 F.3d

at 9–10 (explaining that "ordinary state-law principles of agency or contract" may allow a non-

signatory to be bound by, or acquire rights under, an arbitration agreement). However, courts

often consider arbitration awards that "attempt[] to bind a nonparty" as exceeding the

arbitrator's authority. *Lumber Liquidators, Inc. v. Sullivan*, 2011 WL 5884252, at *3 (D. Mass. Sept.

---

[8] Barreras's implication that plaintiff slept on its rights by failing to appeal from the arbitrator's denial of its participation request and from the final arbitration award is also unavailing. **ECF Nos. 30** at 23; **44-1** at 8. It is questionable whether plaintiff, as a non-party to the arbitration, had a right to file an interlocutory or direct appeal of the arbitrator's decisions. *See* 9 U.S.C. § 10 (establishing the context and grounds upon which a party and non-party to an arbitration may seek judicial review).

27, 2011) (collecting cases from the United States Supreme Court and the Second, Sixth, Eighth, and Ninth Circuit Courts of Appeals); *see also* 8 Philip Bruner & Patrick O'Connor, *Construction Law: Award affecting rights of third parties*, § 21:254 (June 2018 Update) (noting that the validity of arbitration awards affecting the rights of non-parties "often depends upon the relationship, if any, between the parties to the arbitration and the third party affected by the ruling").

Barreras has not addressed any of the exceptions that could warrant construing the arbitration award as binding on plaintiff. Rather, Barreras relies on an inconsistency in the arbitration decision to support its position. **ECF Nos. 30** at 16; **32** at 9–10.

The certified English translation of the arbitration decision repeats the arbitration order in three locations. In two of those locations, the award orders, among other things, that the parties "carry out the necessary procedures in the" Puerto Rico Registry of Property to transfer or convey "to Barreras the title over the Building." **ECF No. 27-27** at 2, 31. On a separate page, purporting to reiterate the arbitration award, the text orders the parties "to carry out the necessary procedures in the Registry of the Property to convey to Barreras the title over the Building, *free of liens and encumbrances.*" *Id.* at 30 (emphasis added). This page with the italicized "free of liens" language ("page 30"), omits several other orders appearing in the other two recitations of the award, namely, the requirement that the parties bear their own costs and attorney fees, the provision addressing the arbitrator's compensation, and the ruling indicating that the award is a full settlement of all claims and counterclaims submitted. *Id.* at 2, 30–31. Additionally, page 30 bears an editing mark—highlighted writing followed by bracketed initials

"RH3"—presumably from the typing software used to create the document, suggesting that this page was not intended to be included in the final version of the award.[9] Considering the above, the Court would be remiss to accept Barreras's invitation to explicitly interpret this outlier page as fully and validly extinguishing the rights of a non-signatory non-party to the arbitration proceeding. *Cf. FirstBank of P.R. v. Rosta Family Ltd. P'ship*, 271 F.Supp. 3d 377, 383, 385 (D.P.R. Sept. 14, 2017) (citing Puerto Rico law as recognizing that mortgage holders "are indispensable parties in lawsuits where the validity of deeds which give rise to registrations and mortgage guarantees are under attack" and the failure to join an indispensable party deprives the court of the power to affect that party's rights). The validity of the arbitration order is not at issue before the Court, but the discrepancy in the order's terms highlights the "actual controversy" between the parties for DJA purposes.

### B.      Declaration sought

The remedy plaintiff seeks under the DJA requires the Court to apply Article 59(7), which permits mortgaging of registered leasehold interests. "A lease agreement duly registered in the Property Registry becomes a real right that has an effect against a third party." *Puerto Rico Ports Auth. v. Hotel Airport, Inc.*, 2011 WL 7905196, at *4 (T.C.A. June 30, 2011) (certified translation at

---

[9] Page one of the certified translation of the arbitration decision, under the heading "Arbitration Award Findings of Fact and Conclusions of Law I. Arbitration Award," describes the award without the "free of liens" language. **ECF No. 27-27** at 1. The final page of the arbitration decision, under the heading "Award (Translation for the benefit of the AAA Case Manager)," containing the arbitrator's own English translation of the award, also lists the award without the "free of liens" language. *Id*. at 1 n. 1, 31. Meanwhile, page 30, which is also part of the certified translation, is the only page that contains the "free of liens" language and lists it under a heading titled "Order." *Id*. at 30.

**ECF No. 26-2**) (citing *Garage Coop. de Sabana Grande v. Arco Caribbean, Inc.*, 111 D.P.R. 52, 54, 11 P.R. Offic. Trans. 70 (P.R. 1981)). Under Article 59(7), "[a] registered leasehold interest" is mortgageable "as long as the lessee is authorized to sell, assign, sublet or mortgage his/her right." P.R. Laws Ann., tit. 30, § 6086(7); *see P.R. Ports Auth.*, 2011 WL 7905196 at *5 (citing P.R. Laws Ann., tit. 30, § 2554(6), the predecessor statute to Article 59(7)). Article 59(7) protects a mortgage interest on a lease by conferring to the mortgage holder a right of subrogation into the position of the lessee when the lease is terminated "due to causes attributable to the will of the lessee." *See* P.R. Laws Ann., tit. 30, § 6086(7); *P.R. Ports Auth.*, 2011 WL 7905196 at *8–9. "[V]iolation of any of the conditions stipulated in the [lease] agreement" is considered a "cause[] attributable to the will of the [lessee]" under Article 59(7), triggering the mortgage holder's right to subrogation. *P.R. Ports Auth.*, 2011 WL 7905196 at *8 (noting that "all those actions that would lead to eviction" under Puerto Rico law are "causes attributable to the will of the [lessee]"). Subrogation under Article 59(7) is more akin to "a substitution of the tenant-debtor" in both the tenant's rights and obligations under the lease. *Ramón Grau Estate v. Trigal Court I Assocs., S.E.*, KLCE9500018 (T.C.A. Mar. 21, 1995) (certified translation at **ECF No. 26-1** at 13–14) (citation and internal quotation marks omitted) (involving the mortgage holder's subrogation after the tenant breached the lease term requiring it to pay the property taxes). Thus, under Article 59(7), a mortgage holder that is not a party to an underlying eviction case is not "without a remedy." *P.R. Ports Auth.*, 2011 WL 7905196 at *9.

Though the history of this case is procedurally complicated, the facts relevant to the Article 59(7) determination are simple and undisputed: (1) the Deed of Lease was properly recorded; (2) it entitled the lessee to assign and sub-lease its right; (3) Gables was the most-recent lessee; (4) plaintiff, "as holder of Gables' mortgage[,] has a security on the recorded lease," **ECF No. 15-1** at 6; and (5) the lease was cancelled "for causes controlled by the will of the lessee," namely, Gables's nonpayment of the property taxes. Based on these facts, the plain language of the statute permits plaintiff, as mortgagee, to "subrogate [its] place and stead as assignee . . . by decision of a competent court." *Id*. This is precisely the remedy now sought by plaintiff.

Rather than dispute the applicable facts, Barreras raises several tangential arguments against application of Article 59(7). Barreras claims that although plaintiff was "a mortgagee with subrogation rights under Art. 59(7)," plaintiff lost those rights upon the finalization of the arbitration award. **ECF No. 30** at 28**.** The Court has already rejected this argument. Alternatively, Barreras raises several arguments attempting to undermine the legitimacy of plaintiff's rights as creditor and, presumably, thereby negate the applicability of Article 59(7).

First, Barreras suggests that the Deed of Lease prohibited the lessee from mortgaging the lease and that this prohibition is, in fact, why the arbitrator denied the mortgagees' requests to intervene or attend the arbitration proceedings. **ECF Nos. 30** at 28–29; **32-2**. The clear language of the arbitrator's decisions refutes this assertion. Barreras also fails to identify where in the Deed of Lease its consent is mandated as a precondition for a tenant to mortgage its leasehold interest. *See* Loc. Civ. R. 56(e) (advising that assertions of fact not supported by record citations will be

disregarded on summary judgment). And, it is hard to imagine that such an affirmative restriction on mortgaging would exist in the 1960 Deed of Lease where an "essential condition" to the agreement was that the lessee invest at least $1 million in constructing a commercial building on the parcel. **ECF No. 27-4** at 9–10. It is also doubtful that any such "vice of consent" would necessarily render the mortgages "null, invalid or ineffective." *See P.R. Ports Auth.*, 2011 WL 7905196 at *8.

Next, Barreras suggests that because plaintiff acquired its creditor rights "at a discounted price" as a "litigious credit," i.e., already in foreclosure proceedings initiated by Scotiabank, plaintiff's rights as a creditor under Article 59(7) are somehow undermined. Barreras argues that plaintiff's rights are further tarnished by the fact that Scotiabank acquired its rights after the FDIC closed R-G Bank. **ECF Nos. 30** at 33; **44-1** at 15. Similarly, Barreras argues that because plaintiff is a sophisticated party, it knowingly took a calculated risk in acquiring Gables's mortgages, remarking that the Deed of Lease permits termination of "its security status as mortgagor" upon the lessee's breach. **ECF No. 30** at 25.

Barreras's reading of the Deed of Lease is unsupported by the plain language of the document and Barreras otherwise offers no legal support for these arguments. Additionally, the plain language of Article 59(7) provides no basis to infer that the means by which a creditor attains its rights are relevant to the statute's applicability.[10]

---

[10] The Court also fails to see how plaintiff's rights under Article 59(7) are affected by the availability of a remedy against Gables "personally" for the debts secured by the mortgages. **ECF Nos. 30** at 27–29; **39** at 17.

Barreras also cites section 13 of Article 59 as precluding plaintiff's argument. **ECF No. 30** at 27–29, 33. While the parties do not provide a certified translation of the most-current enactment of that provision, Barreras suggests that the prior enactment contains negligible differences and plaintiff does not object. **ECF No. 30** at 28; **ECF No. 39** at 18. This statute enumerates another property right that is mortgageable under Puerto Rico law: "[a] building built on another's land but without prejudice to the right of the owner of the land, and with the understanding that only the right that the builder has on the building is subject to such a lien." P.R. Laws Ann., tit. 30, § 2554(13).

Barreras would have the Court believe that this provision renders plaintiff's mortgages over the leasehold and buildings a prejudicial interference with Barreras's title to the buildings. **ECF No. 30** at 28, 33. This reasoning is circular.[11] The statute is unhelpful to Barreras's position. As plaintiff concisely explained, the statute merely ensures that when "the building and the land are separated items for recordation purposes," a mortgage on the building "only covers the building and does not extend to the land." **ECF No. 39** at 18.

Barreras next argues that Article 59(7) cannot be applied retroactively because the "Mortgage Law in place when the lease was executed in 1960, did not allow for the mortgage of a lease agreement." **ECF No. 44-1** at 10–14. For support, Barreras quotes extensively from a scholarly article entirely in Spanish, providing no certified English translation. *Id.* at 11–12.

---

[11] Barreras also argues that plaintiff's conduct "constitutes 'forum shopping,'" and a "frantic" effort to recoup on a bad investment that amounts to harassment under Article 59(13). **ECF Nos. 30** at 35; **44-1** at 15. This argument makes little logical sense and accordingly requires no further discussion.

Not only is this is a new argument that Barreras impermissibly raises for the first time in its reply brief, but it also relies on legal authority that has not been officially translated into English. "It is clear, to the point of perfect transparency, that federal court proceedings must be conducted in English." *United States v. Román-Huertas*, 848 F.3d 72, 76 (1st Cir. 2017). Accordingly, "federal judges must not consider any untranslated documents placed before them." *United States v. Millán-Isaac*, 749 F.3d 57, 64 (1st Cir. 2014); *see* Loc. Civ. R. 5(g).

Nonetheless, according to Barreras's own characterization, the article merely presents a professor's conjectural theory against retroactivity. **ECF No. 44-1** at 11–14. While a court reviewing a summary judgment motion will "draw all reasonable inferences in the light most favorable to [the non-moving party]" it "will not draw unreasonable inferences or credit bald assertions, empty conclusions, [or] rank conjecture." *Vera v. McHugh*, 622 F.3d 17, 26 (1st Cir. 2010) (alteration in original) (emphasis, citations, and internal quotation marks omitted). Moreover, the plain language of Article 59(7) supports a contrary interpretation; for a leasehold to be mortgageable under the statute, it must allow the lessee to "sell, assign, sublet *or* mortgage his/her right." The use of the conjunction "or" casts a wide net, suggesting a legislative intent to render mortgageable leaseholds that do not specifically address mortgage rights, such as long-term leases executed before Article 59(7)'s enactment.

Barreras also argues for the first time in its surreply that plaintiff cannot invoke the protections of Article 59(7) because Scotiabank is "as culpable as Gables in causing the lease to be terminated" by failing to timely pay the property taxes itself. **ECF No. 44-1** at 9. This untimely

argument is refuted by the plain language of Article 59(7). The statute does not identify the ability of a mortgagee to cure the lessee's default as an exception to subrogation. Rather, the statute requires only that the recorded lease be terminated "due to causes attributable to the will of the lessee."

Last, Barreras requests that the Court exercise its discretion to decline to issue a declaratory judgment. **ECF No. 30** at 32. Given Barreras's fairly disingenuous tactics in this proceeding, its double-talk, and its vehement opposition to plaintiff's intervention and subrogation requests, which have undoubtedly complicated and prolonged the parties' dispute, the Court declines Barreras's request.

## IV.    Conclusion

Plaintiff's motion for summary judgment, **ECF No. 26** is **GRANTED**. The statement of undisputed material facts at **ECF No. 27** is **NOTED**. The filings at **ECF Nos. 58**, **59**, **61**, are **MOOT**. Barreras's cross-motion for summary judgment is **DENIED**. **ECF No. 30**. Clerk of Court shall enter judgment as to all defendants in favor of plaintiff. Plaintiff shall submit a proposed declaration for the Court's consideration by **April 30, 2019**.

SO ORDERED.

At San Juan, Puerto Rico, on this 28 day of March, 2019.

S/AIDA M. DELGADO-COLÓN
**United States District Judge**